# In the Matter of John Edward JOYCE.

## No. 74–1543.

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1975.

W. A. Thurmond, James T. McNutt, Jr., Joseph A. Calamia, John L. Fashing, El Paso, Tex., for appellant.

Ralph Harris, Frank B. Walker, Asst. U. S. Attys., El Paso, Tex., for appellee.

Before THORNBERRY, GOLDBERG and GODBOLD, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an appeal from a judgment of the district court holding appellant Joyce, an employee of Mountain States Telephone and Telegraph Company ("Mountain Bell"), in criminal contempt of an order issued by a federal Magistrate and approved by the District Judge, directing Mountain Bell to participate with a customs agent in the installation of an electronic surveillance device known as a "pen register" (a/k/a "dialed number recorder"). The judgment entails a thirty day sentence in the custody of the Attorney General, which the district court agreed to stay pending the decision of this appeal. For the reasons developed hereinafter, we reverse.

## I. FACTS

For some time prior to February 1974, federal agents had investigated a certain individual in the El Paso, Texas area for illegal drug importation. As the investigation progressed, the officers were able to discover the suspect's address and telephone number. They concluded that the telephone was being used regularly in furtherance of illicit marijuana transactions.

On February 4, 1974, appellant Joyce, with 26 years of service at Mountain Bell, was appointed chief security officer over the operations served by the El Paso facility. In the performance of his duties Joyce was directly responsible to Mr. Clarence Fleming, Area Security Manager in Albuquerque, New Mexico, and indirectly responsible to Mr. J. F. Doherty, Director—Corporate Security, of the New York parent company, American Telephone and Telegraph.[1]

On Friday, February 8, 1974, the head of the narcotics investigation, special customs agent George R. Brown, met

---

1. At trial Mr. Doherty explained that while each Bell System subsidiary functions with relative autonomy, a subsidiary's employees are bound by a parent company policy "recommendation" once the operating company's management decides to adopt the "recommendation."

with United States Magistrate Jamie Boyd to discuss obtaining an authorization for a "pen register" to be installed on the suspected importer's telephone. Agent Brown submitted an affidavit setting forth his belief that probable cause existed for the "pen register," and his belief that a record of numbers dialed from the suspect's telephone would yield or lead to evidence of narcotics offenses. Later that day the agent contacted appellant at Mountain Bell and indicated that a court order authorizing the "pen register" would be issued the next morning. Agent Brown testified that he furnished appellant's office with the suspect's name, address, and telephone number, and informed appellant that Mountain Bell's technical assistance would be needed for the installation.

The next morning agent Brown submitted an amended affidavit, Magistrate Boyd signed a "pen register" order prepared by agent Brown, and around noon District Judge Guinn also signed the order. Appellant, who was present at the courthouse, received a copy of the order. Sometime during that Saturday afternoon appellant also received a letter from Judge Guinn, in which the Judge emphasized that time was of the essence, concluding: "I, therefore, request that you [Joyce] do everything possible to expedite this matter in order that the investigation may proceed without any delay. Your cooperation is greatly appreciated."

Neither the letter from Judge Guinn nor the order itself expressly directed appellant personally to furnish any service to the agents. Whereas the letter was couched in precatory language, the pertinent portion of the order read as follows:

> IT IS FURTHER ORDERED, upon request of the applicant [agent Brown], that the *Mountain Bell Telephone Company,* a communications common carrier as defined in Section 2510(10) of Title 18 U.S.C., shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to enable the installation and operation of the above-described mechanical devices.

(emphasis supplied). It does not appear from the record that any other document, signed by either Magistrate Boyd or Judge Guinn, was ever delivered to appellant in respect to the "pen register" prior to the district court's issuance of its show cause order.

As the afternoon of Saturday, February 9, wore on, the government's plans for prompt installation of a "pen register" began to unravel. Appellant testified that at first he was unclear about the kinds of technical assistance he was expected to furnish, not being a technician. Agent Brown corroborated appellant and testified that he, Brown, then requested two types of assistance: cable and pair information for the color pick cable, and a private leased line from the box containing the terminal for the suspect's telephone, whereupon the agents would, as was customary, complete the hook-ups. According to agent Brown, appellant seemed willing to cooperate in executing the court's order, but also indicated a desire to confer with corporate counsel concerning its legal implications for Mountain Bell and participating employees. The agent had also indicated to appellant that some form of physical assistance from Mountain Bell—for instance the installation of boosters on the line—might be expected.

In the early evening a conference telephone call transpired among appellant, his supervisor Mr. Fleming, Bell attorney Joseph O'Neil in Denver, and Magistrate Boyd. O'Neil took the position that Mountain Bell policy, adopted pursuant to an AT&T "recommendation" prepared by Mr. Doherty,[2] forbade telephone company participation in a "pen register" installation effected outside the safeguards of the federal wiretap statutes, 18 U.S.C. § 2510 et seq., and inferentially

---

**2.** The "recommendation" had been issued in the form of a letter to Bell subsidiary security managers and security counsel, dated June 18, 1973, and made part of the record herein as a sealed exhibit. O'Neil testified below that he knew, as company counsel, that Mountain Bell had adopted the policy contained in the letter.

§ 2516.[3] O'Neil testified, however, that he informed Magistrate Boyd that Bell would supply, pursuant to a subpoena, whatever *information* the agents might require in order to conduct their own installation of the device. According to O'Neil, Boyd answered: "I will sign anything to get this moving." O'Neil then testified that all parties agreed upon the subpoena alternative, that appellant would pick up agent Brown and drive to Boyd's home, and that Boyd would prepare the subpoena for immediate compliance. Magistrate Boyd corroborated O'Neil's testimony concerning the discussion of the subpoena, but stated that he did not understand O'Neil to have offered information in response thereto.

At about 7:30 Saturday evening, and subsequent to the conference call, appellant notified agent Brown by telephone that Mountain Bell had determined not to comply with the court's order, but that the necessary information could be furnished under subpoena. Appellant drove to the agent's motel, but agent Brown had left. Another agent suggested that it was too late to disturb Magistrate Boyd at home, anyway, so appellant returned home. The next morning appellant located agent Brown and again suggested that they obtain the subpoena from the magistrate. Agent Brown quickly rejected the idea, declaring, according to appellant's testimony, that "the court order would hold." Asked the reason for the sudden turn of events, agent Brown responded that "he had talked to the Judge and the Judge said the Court order would hold and that it would be served with papers Monday morning." Earlier in the day (Sunday) agent Brown had sworn out an affidavit before Magistrate Boyd, representing that "[i]n the conversation between affiant and Mr. John Edward Joyce at approximately 7:30 p. m., on February 9, 1974, Mr. Joyce stated that he would not follow the Court's Order."

**3.** These statutes are otherwise known, and occasionally referred to herein, as Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended ("Title III"). With respect to the authorization requirements under § 2516 for electronic surveillance methods

The next morning, Monday, February 11, 1974, appellant was served with a show cause order, signed by Judge Guinn, charging criminal contempt of court. Appellant's motion for a continuance was overruled, his trial took place two days later, and Judge Guinn entered immediate judgment declaring appellant guilty for having "deliberately and willfully" defied the court's order and "personal instructions" to furnish information and assistance incident to the recorder installation.

## II.  DISCUSSION OF THE EVIDENCE

At the threshold, we note that the great bulk of the foregoing factual summary concerns matters which, in their substance, went undisputed at trial. Appellant does not contest that the District Judge approved the "pen register" order; that the order directed Mountain Bell to assist in the device's installation; that the Judge "requested" appellant's cooperation; or that he, appellant, refused ultimately to cooperate. We are mindful of our responsibility under Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941), to view the evidence and reasonable inferences in the light most favorable to the government. It matters not whether the trial occurred before a judge or a jury, *cf.* Gorman v. United States, 5th Cir. 1963, 323 F.2d 51, for the test of the sufficiency of evidence is the same: could a fair-minded and reasonable trier of fact accept the evidence as probative of defendant's guilt beyond a reasonable doubt? *See* United States v. Warner, 5th Cir. 1971, 441 F.2d 821, cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58.

Yet, "[w]hile this standard is unequivocal, *Glasser* does not require complete judicial abdication to the determination of the trier of fact." United States v. Ferg, 5th Cir. 1974, 504 F.2d 914. We are closely counselled by this

covered by Title III, see United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). It is undisputed that, if applicable, Title III was not complied with in the obtaining of the "pen register" order.

countervailing principle in our review of this case, for three reasons: First, at the trial below the United States Attorney did not present a single witness or ask a single question, even though he was present throughout, and even though the alleged contempt was committed, if at all, outside the "actual presence of the court." *See* F.R.Crim.P. 42(a). Instead, the District Judge, who had already made known his interest in the "pen register" on several occasions, conducted the entire prosecution single-handedly. Second, in his brief and at oral argument the appellant vigorously attacked the sufficiency of the evidence to sustain his conviction. The government filed no written response to this point whatsoever, and, when questioned at oral argument, simply suggested that this Court read the transcript and find, without further guidance, our own theory to support the judgment. Third and finally, we have accepted the ·government's invitation. After a fine-toothed combing of the record, we find no substantial evidence to support the following findings made by the district court: (a) that appellant "was furnished with a signed copy of the court's order *directing him* . . . to furnish the applicant forthwith all information, facilities, and technical assistance necessary to enable the installation and operation of the court-ordered pen register" (emphasis supplied); (b) that appellant "clearly understood the court's order . . . ."; (c) that appellant, "after receiving a signed copy of the court's lawful order and *personal instructions* from the United States District Judge . . . *deliberately and willfully* denied applicant the necessary information, facilities, and

technical assistance . . . ." (emphasis supplied); (d) that appellant "*willfully refused to obey* the court's lawful order" (emphasis supplied); or (e) that "the evidence establishes beyond a reasonable doubt [that appellant's conduct] constitutes a *knowing and willful defiance* of the court's lawful order" (emphasis supplied).

■ In our view the compelling thrust of the evidence is entirely to the contrary. Appellant testified that he wanted to cooperate in the utmost manner, "both legally on our side and with the gentlemen making the charges. I really wanted to help them." This testimony was never contradicted. Indeed, it was largely corroborated by the narratives of agent Brown and Magistrate Boyd. Meanwhile, the district court's finding that appellant "clearly understood" the order is fully undermined by the testimony of these two gentlemen. Agent Brown testified that appellant "was a little bit unaware of what a pen register was." [4] Magistrate Boyd stated, "I don't think—he didn't seem to understand to me, to tell you the truth. I don't think Mr. Joyce understood and I don't think he was getting a whole lot of help, to tell you the truth, from· the company."

Significantly, there is a total failure of proof that appellant, in his position as local security chief, possessed either the authority or the capability to furnish the loosely-defined technical assistance. Magistrate Boyd testified that appellant had specifically indicated a lack of authority. Agent Brown recounted that the basis for appellant's hesitation was the fear of possible civil or criminal liability, and that appellant had said he

---

4. A pen register is a mechanical device attached to a given telephone line and usually installed at a central telephone facility. It records on a paper tape all numbers dialed from that line. It does not identify the telephone numbers from which incoming calls originated, nor does it reveal whether any call, either incoming or outgoing, was completed. Its use does not involve any monitoring of telephone conversations.
United States v. Giordano, 416 U.S. 505, 549, 94 S.Ct. 1820, 1842, 40 L.Ed.2d 341 (1974)

(Powell, J., concurring in part and dissenting in part).
Notwithstanding the apparent sterility of a pen register implied by this definition, the expert testimony below indicated that once a pen register has been installed, a full wiretap "interception" of telephone conversations may be accomplished simply by attaching headphones or a tape recorder to the appropriate terminal on the pen register unit.

would have to clear his participation with the legal department. Two other witnesses, Mr. Doherty and Mr. Fleming, testified without contradiction that appellant lacked authority to furnish the ordered assistance on behalf of Mountain Bell.

■ The general power of a federal court to punish for criminal contempt is found in 18 U.S.C. § 401, which authorizes a fine, or imprisonment, in the court's discretion, for "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." Engrafted upon this language is the requirement of both a contemptuous act and a willful, contumacious, or reckless state of mind. In re Farquhar, 1973, 160 U.S.App.D.C. 295, 492 F.2d 561, 564; Sykes v. United States, 1971, 144 U.S. App.D.C. 53, 444 F.2d 928, 930. As in United States v. Lansky, 5th Cir. 1974, 496 F.2d 1063, 1071, "[w]e have carefully detailed the facts and circumstances necessary to a proper determination" of whether defendant Joyce "deliberately and willfully denied applicant the necessary information, facilities, and technical assistance necessary to enable the installation and operation of the ordered pen register and have [sic], thereby, willfully refused to obey the court's lawful order." Assuming *arguendo*, without deciding, the correctness of the government's legal position in this case, we hold that the evidence is insufficient to support a finding of guilt beyond a reasonable doubt. We do so without passing on appellant's contention that the order is unenforceably vague and drawn in violation of due process.

There exists an alternative basis for our holding. The Sixth Circuit recently had occasion to review a strikingly analogous situation in the case of In re La Marre, 6th Cir. 1974, 494 F.2d 753. During the course of a lawsuit it appeared to the District Judge that the parties might settle, with moderate encouragement. Defendant La Marre, who was employed as claims manager by an insurance company involved in the suit, disliked the figure around which the parties were negotiating. To expedite matters, the court several times directed the attorneys employed by the insurer to contact La Marre and request his presence at conferences. La Marre refused four such invitations, and eventually was adjudged in criminal contempt of the district court. In a memorandum decision the District Judge used the words "required" and "ordered" when speaking of La Marre's appearance. The Sixth Circuit noted that while these words, like Judge Guinn's words, doubtless reflected the Judge's subjective intent, the word actually communicated to the defendant was the less mandatory word "request." That is exactly the word used in this case by the District Judge in his letter to appellant.

The Sixth Circuit reversed the contempt conviction, stating:

> To recapitulate, we believe that it goes without saying that the preceding "requests" of the District Judge which were entered on the court record, no matter how appropriate they may have been, were not orders which served to put La Marre on notice that his freedom was in jeopardy if he failed to comply. This was knowledge that he was entitled to have.

494 F.2d at 758–759. Perhaps the court's analysis should not be greatly extrapolated beyond the facts then before it, but we deem it significant that the Sixth Circuit quoted with approval the following language from Berry v. Midtown Service Corp., 2d Cir. 1939, 104 F.2d 107, 111:

> Despite our respect for the views of Judge Van Fleet, we are unable to agree with his opinion that a stay directed to one party can be expanded by implication into an order upon the other. The authorities he cites do not extend so far. Before a person should be subject to punishment for violating a command of the court, the order should inform him in definite terms as to the duties imposed upon him. Once we adopt the principle that an express order to one party carries implications of duties imposed upon the other, it

would be difficult to set limits upon the doctrine. We believe it is a wise policy to punish as contempt only the disobedience of some express command; and such we understand to be the general rule.

 We believe this reasoning from *Berry* to be well-founded, and we believe that its application in the *La Marre* case is equally appropriate here. To complete the chain of logic, if anyone was guilty of criminal contempt in this case, it was Mountain Bell—against whom the order ran but no charges were pressed—not appellant Joyce. One might even argue that this is a more compelling case for the defendant than *La Marre*, given that Joyce, unlike La Marre, appeared to do everything in his power to accommodate the district court.

## III. CONCLUSION—POSTSCRIPT

 Our decision today carries with it the direction that the contempt charges be dismissed as to the appellant. He has filed no motion for a new trial, and we are unable to conceive that any useful purpose would be served by reprosecution. *See* United States v. Apollo, 5th Cir. 1973, 476 F.2d 156, 158 n. 1; United States v. Musquiz, 5th Cir. 1971, 445 F.2d 963, 966. In addition, our disposition renders it unnecessary to consider the other issues briefed by the parties: (1) whether a "pen register" order unaccompanied by a wiretap application is within or without Title III;[5] (2) whether compliance with the order in this case might have subjected Mountain Bell and/or appellant to civil or criminal liability;[6] (3) whether a federal court has the authority to order a wire carrier or its employees to participate with law enforcement officials in the installation of a "pen register" pursuant to the court's power to issue search warrants;[7] and (4)

whether the doctrine of United States v. UMW, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947),[8] precludes a party in appellant's position from defending noncompliance with a court order on the ground that the court lacked legal power to issue the order.

Reversed with directions to dismiss.

---

5. *See* United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 1843, 1844–1846, 40 L.Ed.2d 341 (1974) (Powell, J., concurring in part and dissenting in part); Korman v. United States, 7th Cir. 1973, 486 F.2d 926, 932; United States v. Lanza, 341 F.Supp. 405, 422 (M.D. Fla.1922); United States v. King, 335 F.Supp. 523, 548–549 (S.D.Cal.1971).

6. *See* 18 U.S.C. §§ 2511, 2520; 47 U.S.C. §§ 501, 605.

7. F.R.Crim.P. 41; *cf.* Application of United States, 9th Cir. 1970, 427 F.2d 639.

8. *See* United States v. Dickinson, 5th Cir. 1972, 465 F.2d 496, 509–510.